1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ROBERT K. NOELL,                        No. CIV S-06-0683-CMK

12              Plaintiff,

13        vs.                              MEMORANDUM OPINION AND ORDER

14   MICHAEL J. ASTRUE,[1]
     Commissioner of Social Security,
15
                Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21   plaintiff's motion for summary judgment (Doc. 12) and defendant's cross-motion for summary

22   judgment (Doc. 13).

23   / / /

24   _____

25        [1]      Pursuant to Federal Rule of Civil Procedure 25(d), Michael J. Astrue is
     substituted for his predecessor.  The Clerk of the Court is directed to update the docket to reflect
26   the above caption.

                                            1

## I. BACKGROUND

Plaintiff applied for social security benefits on April 18, 2002.  In his application, plaintiff claims that his disability began on February 28, 1997[2].  Plaintiff claims his disability consists of ". . . a bulging disk in my lower back and one in my neck, also my upper body is rotating to the right. HBP. Diabetic."  Plaintiff is a United States citizen born February 13, 1962 with a high school education equivalence.

### A.    Summary of the Evidence

The certified administrative record ("CAR") contains medical records regarding plaintiff's physical impairments from the following sources:  (1) West Anaheim Medical Center (CAR 136-138); (2) Richard J. Ritter, M.D. (CAR 139-140); (3) Mercy Medical Center (CAR 141-166); (4) Fairchild Medical Center (CAR 167-245; 246-258; 389); (5) Guy Corkill, M.D. (CAR 259-275; 586-594); (6) Bruce Riger, M.D. (CAR 276); (7) Reynaldo Abejuela, M.D. (CAR 277-282); (8) Scott Valley Rural Health Clinic (including Sandra Lotstein, D.O.) (CAR 283-332; 387-388); (9) DSS (CAR 333-386); and (10) Siskiyou Behavioral Health (CAR 390; 391-399).  Together, these records cover the time period from August 1999 through May 2005. The following is a chronological review of these records.

The first medical records included in this case was from an emergency room visit at West Anaheim Medical Center in August 1999, wherein plaintiff was seen for chronic back pain.  Plaintiff was referred to an orthopedist of his choice and was instructed to try Aleve. (CAR 138).  Plaintiff was then seen by Dr. Ritter on October 5, 1999.  Plaintiff complained of back pain for approximately three years, which had increased.  Dr. Ritter found plaintiff's range-of-motion of lumbar spine to be limited with flexion to 70 degrees, extension to 20 degrees, with an X-ray of the lumbar spine showing slight narrowing of the L5-S1 disc space; otherwise normal.

---

[2]    Plaintiff's Application for Disability Insurance Benefits states plaintiff's disabling condition began on February 28, 1997.  (CAR 50).  However, the court notes that on the Disability Report Adult, plaintiff claims his disabling condition began on February 11, 1997 (CAR 57), which is the date the ALJ used in her decision.

1  (CAR 140).  Dr. Ritter indicated plaintiff should be on Motrin 600mg, and a lumbosacral back

2  support.  Plaintiff returned for reevaluation on November 1, 1999, stating he still had pain and

3  had not been able to get his back brace.  Dr. Ritter prescribed Tylenol #3, and directed plaintiff to

4  return in two weeks.  (CAR 139).  Plaintiff then missed some appointments (CAR 139), and

5  there are no additional records from any follow-up with Dr. Ritter.

6             On May 4, 2000, Plaintiff was seen at the emergency room at Fairchild Medical

7  Center with low back pain.  Plaintiff had a lumbar spine 5 views, which showed an unremarkable

8  lumbosacral.  (CAR 244).  This lumbar spine showed the bony alignment in the lumbosacral

9  spine was normal, with the disc spaces and sacroiliac joints maintained and intact pedicles and

10  posterior elements.  As a follow up, plaintiff was seen at Scott Valley Rural Health on May 19,

11  2000, and had physical therapy ordered along with Ibuprofen and Vicodin.  (CAR 332).  This

12  was followed up with another visit on June 16, 2000, after four weeks of physical therapy which

13  provided only minimal improvement.  (CAR 330).  His physical therapy was extended for four

14  more weeks, and another MRI was ordered.  Plaintiff was seen in the emergency room again on

15  June 18, 2000.  He then had another MRI done on July 27, 2000.  (CAR 241).  This MRI showed

16  a small disc bulge posteriorly and on the left L5-S1 without nerve root compression, but an

17  otherwise unremarkable MRI lumbar spine.  This MRI specifically showed:

18              The vertebral body alinement is within the limits of normal.  The
               bone marrow signal intensity appears unremarkable.  From T11
19             through L5 the disc spaces are will maintained.  The central T2
               signal intensity appears unremarkable.  No disc bulge or herniation
20             is seen.  The neuroforamina are widely patent.  At L5-S1 there is
               mild decrease in the central T2 signal intensity.  There is up to 3
21             mm of anular disc bulge essentially on the left.  The disc bulge
               slightly contacts the left S1 nerve root just prior to passage into the
22             lateral recess of S1 although it does not appear to compress or
               displace it.  There is no evidence of nerve root swelling or
23             abnormal signal intensity.  The neuroforamina at L5-S1 are widely
               patent.  No significant degenerative facet changes are seen.  The
24             region of the conus is normal in position and signal intensity.

25  (CAR 241).

26  / / /

1    In August 2000, plaintiff was determined not to be a surgical candidate, but had

2 the first of three Epidural Steroidal Injections.  (CAR 326, 235, 238-39).  This improved his pain

3 significantly.  (CAR 235).  He also was seen in August 2000, by Dr. Saunders, who assessed him

4 with low back pain with radiculopathy.  Plaintiff was seen another time by Dr. Saunders in

5 October 2000, to whom he complained neither the epidural injections nor the physical therapy

6 have relieved his pain.  (CAR 318-19).  Plaintiff was sent back to physical therapy for back pain

7 in November 2000.  (CAR 316).  On February 23, 2001, plaintiff was seen again by Dr. Saunders

8 who stated plaintiff had no other particular complaints except knee pain, and specifically noted

9 plaintiff ". . . states that his chronic low back pain has resolved."  (CAR 331).

10    On March 15, 2001, plaintiff had an EMG for pain, numbness and tingling in his

11 legs.  The EMG showed "Nerve conduction study demonstrates normal sensory and motor

12 latencies.  H reflexes are absent.  Needle EMG is unremarkable."  The conclusion of this EMG

13 was "Abnormal study.  1. There is soft electrophysiologic evidence of S1 radiculopathy.  2. There

14 is no electrophysiologic evidence of peripheral neuropathy."  (CAR 164).

15    On April 17, 2001, plaintiff was seen by neurosurgeon Guy Corkill, M.D, for a

16 painful and numb right hand.  Dr. Corkill opined that plaintiff has carpal tunnel and that, based

17 on plaintiff's EMG's which indicated an S1 radiculopathy, and plaintiff's "two fairly well

18 documented nerve involvements," plaintiff may have a mononeuritis multiplex or variant.  (CAR

19 265).  However, after an EMG in July 2001 found no evidence of peripheral neuropathy or

20 mononeuritis multiplex, no evidence of cervical radiculopathy on screening needle examination

21 and was a normal electrodiagnostic examination (CAR 270), Dr. Corkill opined that plaintiff's

22 better diabetic control and diet modification helped him recover from the mononeuritis multiplex

23 which had caused the median nerve problems.  (CAR 267).

24    Plaintiff was seen frequently between November 2001 and March 2002 for back

25 pain, receiving prescriptions for physical therapy and pain medication.  (CAR 295-301).  He had

26 a lumbar spine performed in December 2001, which showed a "radiographically unremarkable

4

limited study of the lumbar spine" and suggested that a magnetic resonance imaging may be appropriate. (CAR 169).  In January 2002, he was seen four times in the ER for back pain. (CAR 252, 254, 256, 258).  He had a cervical spine completed in February 2002, which showed "1. Reversal of normal upper cervical lordosis which could be related to chronic muscle spasm. 2. Otherwise radiographically unremarkable cervical spine.  This does not exclude the possibility of disc herniation or other causes of central spinal stenosis." (CAR 251).  An MRI completed in March 2002 showed mild disk bulge between C4-5 and he was referred again to physical therapy. (CAR 248, 294).  Plaintiff was seen again in the ER for back pain in April 2002, wherein the physician questioned whether plaintiff was exhibiting drug-seeking behavior. (CAR 247). Another MRI was completed in April 2002, which showed "Mild annular disk bulge, slightly greater on the left at L5-S1, without evidence of nerve root compression," and plaintiff was again advised to continue with physical therapy. (CAR 246).

In May 2002, plaintiff was seen again for continued back pain. (CAR 289).  Dr. Lotstein  reviewed Dr. Corkill's evaluation of plaintiff noting that, although plaintiff has cervical and lumbosacral disc bulging, surgery was not thought to be helpful.  She recommended analgesics and physical therapy. (CAR 288).  Plaintiff was then seen a number of times from May 2002 until August 2002, but nothing specifically related to his back.  (CAR 283-287).

Besides plaintiff's disability evaluations and Functional Capacities Evaluation, which are discussed below, there are no medical records provided between September 2002 and February 2004.  In February 2004, plaintiff had a C-spine & L-spine.  The Cervical spine showed minimal degenerative change in the cervical spine; the lumbar spine showed an unremarkable lumbosacral spine, but did not exclude disc herniation.  (CAR 592).

In July 2004, plaintiff received another lumbar spine MRI, which showed a "loss of disc hydration signal at L5-S1 with very minimal annular disc bulging at that level.  The other lumbar discs are unremarkable in appearance.  Fat planes in the neural foramina are well maintained bilaterally with no visible stenosis.  The central canal is normal in caliber.  Nerve

1   roots are normally arrayed in the thecal sac."  The conclusion of this MRI was "Minimal

2   degenerative change at the L5-S1 disc.  Otherwise unremarkable MRI of the lumbar spine."

3   (CAR 389).  In November 2004 and again in January 2005, plaintiff was seen by the

4   neurosurgeon for persistent low back pain.  In November 2004, Dr. Corkill suspected that

5   plaintiff was "unstable at L5-S1 with unfortunately minimal supportive work up evidence as an

6   MRI had already been described as minimal ..."  Dr. Corkill recommended plaintiff wear a body

7   brace until an EMG was completed.  (CAR 590).  Then in January 2005, Dr. Corkill stated that

8   plaintiff's EMG of the lower limbs and paraspinals were "reassuringly normal."  (CAR 588).  Dr.

9   Corkill reported that the back brace had provided plaintiff relatively good relief, and opined that

10  plaintiff was "a lot better ... than when I saw him in 2002 ..."  (CAR 588).  Dr. Corkill expected

11  to see plaintiff in March 2005 after treatment for his left shoulder tear.  Dr. Corkill did state that

12  plaintiff is not a bad candidate for surgery, but it is unclear whether that was surgery for his

13  shoulder or his back.  (CAR 588).

14          Plaintiff was seen for a psychological evaluation by a social worker at Siskiyou

15  County Behavioral Health Services on November 23, 2004, pursuant to a referral for mental

16  health counseling by his physician.  (CAR 394-99).  In her report the social worker noted that

17  plaintiff complained of bulging discs and degeneration of spine, but that this conflicted with his

18  doctor's written referral.  (CAR 394).  She also notes that he "appears to be invested in sick role.

19  Despite his claims of constant, severe back pain- he sat cross-legged [in a] chair for 2 hrs."

20  without signs of distress.  (CAR 394).  In her diagnosis, the social worker indicated plaintiff

21  appeared to be moderately over dramatic, and mild to moderately unrealistic regarding his degree

22  of illness.  (CAR 398).  She diagnosed plaintiff with a factitious disorder with combined

23  psychological and physical symptoms, and suggested plaintiff be evaluated for malingering.

24  (CAR 398).

25          Plaintiff's personal physician, Dr. Lotstein, completed a Physician's Functional

26  Capacities Evaluation for plaintiff on October 9, 2002.  (CAR 387-88).  In this evaluation, Dr.

Lotstein opined that plaintiff did not have the capacity to work a full 8 hour day, but would be limited to one hour per day, and he would be unable to sit longer than 30 minutes without increase in back pain. She also opined plaintiff would not be able to stand longer than 30 minutes without increase in back pain and he would need the opportunity to lie down intermittently and frequently during the day. She opined that plaintiff could lift up to five pounds frequently, six to ten pounds occasionally, but never anything above ten pounds. She stated plaintiff could occasionally reach, but could never bend or climb. According to Dr. Lotstein, plaintiff's stamina would decrease as the day progressed due to an increase in back pain, he would be subject to unpredictable absenteeism, and he would experience painful episodes daily. She also stated the pathological basis for plaintiff's pain was annular disc bulging in the L5-S1 region of the back and C4-5 of the neck. No citations to any specific documentation was included in Dr. Lotstein's assessment.

Plaintiff was also evaluated by Bruce Riger, M.D., for a disability evaluation on July 3, 2002. (CAR 276). Dr. Riger's examination showed:

> Neck has full range of motion, shoulders have full range of motion. Patient's straight leg lifts are negative, both lying and sitting. Motor strength is 5/5 throughout. Sensation is slightly diminished to light touch in the left S1 distribution. Gait is within normal limits.

Dr. Riger's assessment was:

> 40 year old with complaints of back pain which exceed those findings suggested on physical exam and MRI. Unfortunately his pain has been persistent and chronic, for whatever etiology. Please also note that in addition to the absence of allegations, there was also no specific request for what was to be done on today's evaluation. Hopefully this will suffice.

Plaintiff was then seen for a social security psychological evaluation on August 1, 2002. (CAR 277-82). The psychologist who examined plaintiff, Reynaldo Abejuela, M.D., found plaintiff to be a male of average weight, who walks normally and did not use any assistive devices for ambulation." (CAR 279). He found "no evidence of sever depression or anxiety at

this time." (CAR 279). Dr. Abejuela diagnosed plaintiff with "Adjustment Disorder with

Depressed Mood" and stated the

> objective findings in the mental status examination revealed mild depression and mild anxiety, with a preoccupation about his pain. . . . In the absence of psychiatric records, based on the history and mental status examination today, the patient's occupational and social functioning is not severely impaired. There is no severe restriction in the patient's daily activities. There are no severe difficulties in social functioning. The patient's concentration, persistence, and pace are not severely impaired. There is no repeated emotional deterioration in work-like situations. His ability to understand, carry out, and remember instructions is not severely impaired. His response to co-workers and supervisors, and the public is not severely impaired. His ability to respond appropriately to work situations is not severely impaired. His ability to deal with changes in a routine work setting is not severely impaired. There are no severe limitations due to emotional impairment.

(CAR 281). Dr. Abejuela opined that the "patient's psychiatric prognosis is fair to good." (CAR

281).

## B. **Procedural History**

Plaintiff's claim was initially denied. Following denial of his request for

reconsideration, plaintiff requested an administrative hearing, which was held on March 9, 2005,

before Administrative Law Judge ("ALJ") L. Kalei Fong.

In her decision, rendered on or about May 26, 2005, the ALJ made the following

findings:

> 1. The claimant met the disability insured status requirements of the Act on February 11, 1997, the date the claimant stated he became unable to work, and continues to meet them through the end of December 1998.
>
> 2. The claimant has not engaged in substantial gainful activity since February 11, 1997.
>
> 3. The medical evidence establishes that the claimant has severe neck and back pain, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The claimant's anxiety and depression are not severe impairments.

4.    The claimant's testimony is not substantially credible for the reasons stated in the body of this decision.

5.    The claimant has the residual functional capacity to perform the physical exertion requirements of work except for frequently lifting more than 10 pounds, occasionally lifting more than 20 pounds, performing repetitive postural tasks and engaging in any climbing of ropes or ladders.  There are no non-exertional limitations (20 CFR §§404.1545 and 416.945).

6.    The vocational expert credibly testified that the claimant is fully capable of performing his past relevant work as a security guard but no other prior occupations.

7.    The claimant has the residual functional capacity to perform a light range of work (20 CFR §§404.1567 and 416.967), eroded only by an inability to climb any ropes or scaffolds or perform repetitive postural tasks.

8.    The claimant is 43 years old, which is defined as a younger age individual (20 CFR §§404.1563 and 416.963).

9.    The claimant possesses the equivalent of a high school education (20 CFR §§404.1564 and 416.964).

10.   In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

11.   Section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16, and Rules 202.20 or 202.21 and 202.22 of Appendix 2, Subpart P, Regulations No. 4, direct a conclusion that, considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled within the framework of these rules.

12.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§404.1520(f) and 416.920(f)).

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits.  After the Appeals Council declined review on February 10, 2006, this appeal followed.

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

9

(9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

including both the evidence that supports and detracts from the Commissioner's conclusion, must

be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

findings, or if there is conflicting evidence supporting a particular finding, the finding of the

Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

Therefore, where the evidence is susceptible to more than one rational interpretation, one of

which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

Cir. 1988).

## III.  DISCUSSION

In his motion for summary judgment, plaintiff argues that the ALJ erred in three

ways in determining he was not disabled.  Specifically, plaintiff argues: (1) the ALJ improperly

rejected the opinions and ultimate conclusions of Plaintiff's treating physician, Dr. Sandra

Lotstein, D.O., concerning Plaintiff's back pain (Ex.11F), and Plaintiff's treating mental health

specialist, Ken Levenson, LCSW, on how Plaintiff's pain and mental health (depression and

ADHD) symptoms combined to render Plaintiff disabled (Ex. 13F), without stating clear and

convincing reasons nor specific and legitimate reasons supported by substantial evidence in the

record for doing so; (2) the ALJ rejected Plaintiff's pain testimony without making specific

findings stating clear and convincing reasons for doing so; and (3) the ALJ erred by basing his

decision on the opinion of the vocational expert, based on an incomplete hypothetical which

/ / /

1   failed to accurately reflect Plaintiff's condition; and by disregarding the vocational expert's

2   answer when questioned concerning Plaintiff's actual condition as evidenced by the record.

3       **A.**   **Rejection of Treating Physician's Opinion**

4         The plaintiff claims the ALJ erred in rejecting and failing to adopt Dr. Lotstein's

5   medical opinion as plaintiff's treating physician.  First, he claims the ALJ erred by rejecting the

6   physician's assessment because it did in fact contain a legible signature, and it was accompanied

7   and supported by extensive medical treatment records and was corroborated by MRI findings

8   verifying the presence of disk degeneration and disc bulges.  Second, Plaintiff claims the ALJ

9   failed to state clear and convincing reasons for rejecting the medical opinion and ultimate

10   conclusions of plaintiff's treating physician, Dr. Lotstein, and erred factually in the reasons he

11   cited for doing so.  Third, he claims the ALJ erred in finding the consultative medical evaluation

12   of Dr. Riger compelling evidence against plaintiff's claim of disability.  Finally, plaintiff takes

13   issue with the ALJ's citation of plaintiff's psychological evaluation at Siskiyou Mental Health

14   Clinic, the possibility (or "diagnosis") of malingering, and the ALJ's failure to consider and

15   explain the weight given to plaintiff's social worker's report.

16       **1.**   **Dr. Lotstein**

17         The weight given to medical opinions depends in part on whether they are

18   proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

19   821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

20   professional, who has a greater opportunity to know and observe the patient as an individual,

21   than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

22   (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

23   to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

24   (9th Cir. 1990).

25         In addition to considering its source, to evaluate whether the Commissioner

26   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

1    in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

2    uncontradicted opinion of a treating or examining medical professional only for "clear and

3    convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

4    While a treating professional's opinion generally is accorded superior weight, if it is contradicted

5    by an examining professional's opinion which is supported by different independent clinical

6    findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

7    1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

8    rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

9    81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

10    the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

11    finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

12    legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

13    professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

14    without other evidence, is insufficient to reject the opinion of a treating or examining

15    professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

16    conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

17    1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

18    see also Magallanes, 881 F.2d at 751.

19            In reviewing the evidence, the ALJ found:

20            ... the record shows that while the claimant has a history of neck
             and back pain, he has not been found to have severe degenerative
21            cervical or lumbar spinal pathology, has not been advised to
             undergo surgery, does not have significantly abnormal objective
22            clinical findings, possesses subjective complaints which are well in
             excess of his mildly abnormal radiological imaging and laboratory
23            studies and his very minimal medical care and a lack of
             prescription pain medications after August 2002 are inconsistent
24            with his pain complaints.  This is consistent with treatment records
             from neurologist, Dr. Guy Corkill, M.D., who noted in April 2002
25            that the claimant's pain complaints are not consistent with his
             mildly abnormal lumbar disk bulging and absence of any nerve
26            compression (Exhibit 6F/3).  Similarly, treatment records from

Scott Valley Rural Health Clinic, dated May 2000 to August 2002, vaguely diagnosed lower back pain with radiculopathy and cervical neuropathy but without any neurological focal findings, decreased range of motion at the extremes of flexion or extension, an absence of spasms and by October 2000, normal neurological testing and straight leg raising (Exhibit 9F).  By February 2001, these records further show that the claimant reported that his chronic lower back pain had now resolved (Exhibit 9F/29).  Even more compelling is a consultative medical evaluation from Dr. Bruce Riger, M.D., dated July 3, 2002, which held that given the claimant's normal gait, negative neurological testing and strait leg raising, absence of any edema, and full neck and upper extremity range of motion, as well as only slightly abnormal lumbar disk bulging pursuant to MRI testing, an etiology could not be established for the claimant's subjective pain complaints (Exhibit 7F).  In addition, the record contains extensive radiological imaging studies containing little in the way of objective clinical findings that could corroborate the claimant's pain complaints.  This evidence consists of MRI scans of the lumbar spine, dated July 27, 2000, which revealed only small disk bulging at the L5-S1 level without nerve root compression (Exhibit 4/75); x-rays of the lumbar spine, dated May 4, 2000, which were negative (Exhibit 4F/78); radiological imaging studies of the cervical spine, dated April 18, 2001, which were substantially normal (Exhibit 4F/43); radiological imaging studies of the lumbar spine, dated December 21, 2001, which were unremarkable (Exhibit 4F/3); radiological imaging studies of the cervical spine, dated February 19, 2002, which disclosed reversal of normal upper cervical lordosis but were otherwise normal (Exhibit 5F/6); MRI scans of the lumbar spine, dated April 3, 2002, which revealed only mild annular disk bulging without evidence of nerve root compression (Exhibit 5F); EMG and nerve conduction studies, dated June 5, 2001, which were normal (Exhibit 6F/12); and MRI scans of the lumbar spine, dated July 7, 2004, which disclosed only minimal degenerative changes at the L5-S1 level and were otherwise normal (Exhibit 12F).  (CAR 18-19).

In addition, the ALJ employed a non-examining state agency physician to review plaintiff's medical records.  The ALJ summarized the state agency physician's review as follows:

... a non-examining state agency physician concluded in July 2002 that the claimant is fully capable of standing, walking about 6 hours and sitting for not more than 6 hours, frequently lifting not more than 10 pounds, occasionally lifting not more than 20 pounds, occasionally climbing, balancing, stooping, kneeling, crouching, and crawling and never climbing any ropes or scaffolds (Exhibit 10F).

/ / /

13

1     The ALJ also found plaintiff's daily living activities to be wide ranging, including

2 "maintaining his own personal appearance, socializing with his family, doing household chores,

3 occasionally cooking, doing some shopping, folding clothes, driving a car, and attending church."

4 (CAR 19).

5     In regards to plaintiff's treating physician's assessment, the ALJ found:

6    ... that because [the physician's functional capacity assessment,
     dated October 9, 2002] does not contain a legible signature by a
7    medical doctor, is not attended with any medical treatment records,
     is not corroborated by any objective clinical findings, and is at
8    odds with the substantially normal radiological imaging studies
     contained in the record and the claimant's extensive daily living
9    activities, it is not accorded any weight. (CAR 19).

10 Thus, the ALJ disregarded plaintiff's treating physician's functional capacity assessment for a

11 variety of reasons.

12     First, plaintiff takes issue with the ALJ's observation that the assessment does not

13 contain a legible signature by a medical doctor.  Plaintiff states that the signature of Dr. Lotstein

14 on the assessment is the same signature on plaintiff's medical records and prescriptions.  The

15 court notes, as does the defendant, that Dr. Lotstein's signature does appear to be the same

16 signature.  However, this was only one reason the ALJ gave for not according the assessment any

17 weight.

18     Second, plaintiff objects to the ALJ's determination that the assessment is not

19 attended with any medical treatment records, is not corroborated by any objective clinical

20 findings, and is at odds with the substantially normal radiological imaging studies contained in

21 the record, and plaintiff's extensive daily living activities.  According to plaintiff, Dr. Lotstein's

22 opinion was accompanied and supported by extensive medical treatment records and was

23 corroborated by MRI findings verifying the presence of disk degeneration and disk bulges.

24 However, in reviewing the assessment, the court notes that Dr. Lotstein was conclusory in her

25 responses and fails to cite to any objective clinical findings to support her analysis of plaintiff's

26 ability.  As the ALJ states, the medical records included in the record, including numerous MRI's

1   and other radiological studies, have found minimal disk bulging without nerve compression in

2   the L5-S1 region.  Also contrary to plaintiff's arguments, the ALJ did not substitute her own

3   opinion over that of plaintiff's doctor.  The ALJ relied on the opinions of Dr. Riger, Dr. Corkill,

4   and the non-examining state physician's interpretation of the objective clinical findings in the

5   record.  Dr. Lotstein does not cite to any objective clinical findings which would lead to a

6   reasonable conclusion that plaintiff's pain is such that he is unable to sit, stand or walk for more

7   than 20 to 30 minutes.

8           The question before the court is whether the treating physician's assessment is

9   contradicted by an examining professional's opinion which is supported by different independent

10   clinical findings.  If so, the Commissioner may resolve the conflict.  In this case, Dr. Lotstein's

11   opinion is contradicted by Dr. Riger's report.  Dr. Riger examined plaintiff and found on

12   examination that plaintiff was in "no acute distress," his neck "has full range of motion,

13   shoulders have full range of motion," plaintiff's "straight leg lifts are negative, both lying and

14   sitting" and that his "sensation is slightly diminished to light touch in the left S1 distribution",

15   but his "gait is within normal limits."  Dr. Riger's assessment was that plaintiff's back pain

16   "exceeded those findings suggested on physical exam and MRI."  (CAR 276).

17           Plaintiff argues that Dr. Riger's evaluation was not compelling evidence against

18   plaintiff's claim of disability because Dr. Riger did not question the reality of plaintiff's back

19   pain nor plaintiff's credibility.  In fact, Dr. Riger reported, without questioning, plaintiff's pain

20   complaints.  However, contrary to plaintiff's interpretation of Dr. Riger's report, Dr. Riger was

21   not charged with determining the credibility of plaintiff's pain complaints.  Dr. Riger's report

22   simply included a recitation of plaintiff's complaints, and sets forth his examination results.  As

23   stated above, Dr. Riger's examination revealed that plaintiff was in no acute distress, had full

24   range of motion in both neck and shoulders, his straight leg lifts were negative, and his gait was

25   within normal limits.  Although Dr. Riger stated "unfortunately his pain has been persistent and

26   chronic, for whatever etiology," his assessment was that plaintiff's "complaints of back pain

15

1  exceed those findings suggested on physical exam and MRI." (CAR 276).    In addition, the ALJ

2  did not question the reality of plaintiff's pain, only the severity of the pain.  The ALJ specifically

3  found plaintiff has severe neck and back pain (CAR 21), but the pain is not severe enough to

4  meet the requirements to find plaintiff disabled.

5          Thus, where there is a conflict, the ALJ may resolve the conflict.  In this case, the

6  ALJ's resolution of the conflict was to give weight to the examining physician's opinion over the

7  treating physician.   This resolution of the conflict was further supported by the non-examining

8  state physician's review, as well as numerous radiological studies.

9          This court finds that plaintiff's treating physician's opinion was contradicted by

10  an examining professional's opinion which was supported by different independent clinical

11  findings, and that the ALJ resolved this conflict.  The ALJ gave specific reasons for rejecting Dr.

12  Lotstein's opinion including a lack of medical records attending the assessment, no corroboration

13  by objective clinical findings, and it conflicted with the radiological studies contained in his

14  medical records.  Therefore, the ALJ set forth "specific and legitimate" reasons supported by

15  substantial evidence for rejecting the treating physician's opinion, and her opinion was supported

16  by substantial evidence in the record as a whole.  This court concludes that the ALJ properly

17  rejected the opinion and ultimate conclusion of plaintiff's treating physician.

18                  **2.    Social Worker**

19          Plaintiff also contends the ALJ erred by not evaluating his social worker's

20  opinion.  Specifically, plaintiff claims the ALJ did not consider the progress notes from Ken

21  Levenson, LCSW, from December 12, 2004.  Mr. Levenson stated that plaintiff's "ability to

22  work at this time appears unlikely at this time and he will continue to require the support and

23  assist of his family in order to remain living independently.  It is my opinion that [plaintiff] will

24  continue to experience significant depression until his legal and medical problems can be

25  resolved."  (CAR 390).

26  / / /

1    In determining whether a claimant is disabled, an ALJ generally must consider lay
2 witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,
3 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay
4 testimony as to a claimant's symptoms or how an impairment affects ability to work is competent
5 evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100
6 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony
7 of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at
8 919.

9    The ALJ, however, need not discuss all evidence presented.  See Vincent on
10 Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain
11 why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,
12 706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored evidence
13 which was neither significant nor probative.  See id. at 1395.  As to a letter from a treating
14 psychiatrist, the court reasoned that, because the ALJ must explain why he rejected
15 uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was
16 controverted by other medical evidence considered in the decision.  See id.  As to lay witness
17 testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court
18 concluded that the evidence was properly ignored because it "conflicted with the available
19 medical evidence" assessing the plaintiff's mental capacity.  Id.

20    In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent
21 disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness
22 had testified about the plaintiff's "inability to deal with the demands of work" due to alleged
23 back pain and mental impairments.  Id.   The witnesses, who were former co-workers, testified
24 about the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.
25 Noting that the lay witness testimony in question was "consistent with medical evidence," the
26 court in Stout concluded that the "ALJ was required to consider and comment upon the

17

1   uncontradicted lay testimony, as it concerned how Stout's impairments impact his ability to

2   work." Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the lay

3   testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

4   Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

5   1054-55.  The court concluded:

6           Because the ALJ failed to provide any reasons for rejecting competent lay
            testimony, and because we conclude that error was not harmless,
7           substantial evidence does not support the Commissioner's decision . . .

8   Id. at 1056-67.

9           From this case law, the court concludes that the rule for lay witness testimony

10  depends on whether the testimony in question is controverted or consistent with the medical

11  evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d at

12  1395.  If, however, lay witness testimony is consistent with the medical evidence, then the ALJ

13  must consider and comment upon it.  See Stout, 454 F.3d at 1053.

14          In this case, Mr. Levenson's opinion is controverted by a psychiatric evaluation

15  done in August 2002.  In that evaluation, Dr. Abejuela found plaintiff's psychiatric prognosis to

16  be fair to good, and his occupational and social functioning not severely impaired.  (CAR 281).

17  Therefore, the ALJ did not err by ignoring Mr. Levenson's controverted opinion.  In addition,

18  plaintiff does not indicate what consideration of this opinion would have done or changed.

19  Plaintiff does not argue that his mental condition is so significant that, combined with his chronic

20  pain, it has the effect of being sufficient to find him disabled.  Such an argument would not be

21  supported by the record.  Therefore, this court finds the ALJ did not err in failing to consider and

22  give weight to Mr. Levenson's opinion.

23      **B.      Plaintiff's Credibility**

24          Plaintiff claims the ALJ erred in rejecting plaintiff's pain testimony for three

25  reasons.  First, that plaintiff's diagnosis of malingering was a tentative "rule out" diagnosis and

26  he was not actually diagnosed with malingering.  Second, that plaintiff's subjective symptoms

1   testimony may not be rejected for lack of objective evidence supporting it.  Finally, that

2   plaintiff's daily living activities were all subject to the limitations imposed by his pain, and that

3   plaintiff's efforts to engage in activities which enable him to live something of a normal life in

4   the face of his painful medical condition should not be used to discredit and reject his claim.

5        The Commissioner determines whether a disability applicant is credible, and the

6   court defers to the Commissioner's discretion if the Commissioner used the proper process and

7   provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

8   credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

9   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

10  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

11  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

12  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

13  credible must be "clear and convincing."  See id.

14       If there is objective medical evidence of an underlying impairment, the

15  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

16  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

17  341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

18  the symptoms alleged, including aggravating factors, medication, treatment, and functional

19  restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

20  the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

21  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

22  prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

23  physician and third-party testimony about the nature, severity, and effect of symptoms.  See

24  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

25  ///

26  ///

Here, the ALJ:

> carefully considered the claimant's symptoms of back and neck pain in terms of the criteria of Social Security Ruling 96-7p and concluded that his complaints are out of proportion to the overall weight of the objective medical evidence of record and other factors of a non-medical nature and therefore, rendered his testimony not substantially credible.  (CAR 18).

The ALJ specifically found, as stated above:

> . . . the record shows that while the claimant has a history of neck and back pain, he has not been found to have severe degenerative cervical or lumbar spinal pathology, has not been advised to undergo surgery, does not have significantly abnormal objective clinical findings, possesses subjective complaints which are well in excess of his mildly abnormal radiological imaging and laboratory studies and his very minimal medical care and a lack of prescription pain medications after August 2002 are inconsistent with his pain complaints.  This is consistent with treatment records from neurologist, Dr. Guy Corkill, M.D., who noted in April 2002 that the claimant's pain complaints are not consistent with his mildly abnormal lumbar disk bulging and absence of any nerve compression (Exhibit 6F/3).  Similarly, treatment records from Scott Valley Rural Health Clinic, dated May 2000 to August 2002, vaguely diagnosed lower back pain with radiculopathy and cervical neuropathy but without any neurological focal findings, decreased range of motion at the extremes of flexion or extension, an absence of spasms and by October 2000, normal neurological testing and straight leg raising (Exhibit 9F).  By February 2001, these records further show that the claimant reported that his chronic lower back pain had now resolved (Exhibit 9F/29).  Even more compelling is a consultative medical evaluation from Dr. Bruce Riger, M.D., dated July 3, 2002, which held that given the claimant's normal gait, negative neurological testing and strait leg raising, absence of any edema, and full neck and upper extremity range of motion, as well as only slightly abnormal lumbar disk bulging pursuant to MRI testing, an etiology could not be established for the claimant's subjective pain complaints (Exhibit 7F).  In addition, the record contains extensive radiological imaging studies containing little in the way of objective clinical findings that could corroborate the claimant's pain complaints.  This evidence consists of MRI scans of the lumbar spine, dated July 27, 2000, which revealed only small disk bulging at the L5-S1 level without nerve root compression (Exhibit 4/75); x-rays of the lumbar spine, dated May 4, 2000, which were negative (Exhibit 4F/78); radiological imaging studies of the cervical spine, dated April 18, 2001, which were substantially normal (Exhibit 4F/43); radiological imaging studies of the lumbar spine, dated December 21, 2001, which were unremarkable (Exhibit 4F/3); radiological imaging studies of the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

cervical spine, dated February 19, 2002, which disclosed reversal of normal upper cervical lordosis but were otherwise normal (Exhibit 5F/6); MRI scans of the lumbar spine, dated April 3, 2002, which revealed only mild annular disk bulging without evidence of nerve root compression (Exhibit 5F); EMG and nerve conduction studies, dated June 5, 2001, which were normal (Exhibit 6F/12); and MRI scans of the lumbar spine, dated July 7, 2004, which disclosed only minimal degenerative changes at the L5-S1 level and were otherwise normal (Exhibit 12F).  More recently,  the claimant underwent psychological evaluation at the Siskiyou Mental Health Clinic in November 2004 where he was diagnosed with malingering as a result of his "sick role that he is very motivated in portraying" (Exhibit 14F/8 and 9).  For these reasons, a non-examining state agency physician concluded in July 2002 that the claimant is fully capable of standing, walking about 6 hours and sitting for not more than 6 hours, frequently lifting not more than 10 pounds, occasionally lifting not more than 20 pounds, occasionally climbing, balancing, stooping, kneeling, crouching, and crawling and never climbing any ropes or scaffolds (Exhibit 10F). Other evidence which is probative on the issue of credibility consists of the claimant's wide ranging activities of daily living which include maintaining his own personal appearance, socializing with his family, doing household chores, running errands, shopping, operating his computer, interacting with friends and neighbors, occasionally cooking, doing some shopping, folding clothes, driving a car, and attending church.  Consequently, the [ALJ found] that because the claimant's subjective complaints are well in excess of the unremarkable radiological imaging studies contained in the record and are at odds with his extensive daily living activities, lack of regular care and fairly benign physical examination findings, his symptoms appear to be the byproduct of malingering and would not preclude him from having the residual functional capacity to perform a light range of work (i.e., prolonged standing, walking, sitting, and lifting not more than 10 pounds and occasionally lifting not more than 20 pounds), eroded only by an inability to climb any ropes or scaffolds and occasionally perform postural tasks.  (CAR 18-19).

20        The ALJ's decision to discredit plaintiff's testimony regarding his pain was based

21   on a number of factors, which were clearly identified.  The ALJ found that plaintiff's excessive

22   pain complaints were not consistent with the objective clinical findings, including only a mildly

23   abnormal disk bulging without nerve compression, that plaintiff received no advisement to

24   undergo surgery, had received a lack of medical care and lack of prescription pain medications

25   after August 2002, and he reported to his physician in February 2001 that his chronic low back

26   ///

1  pain had been resolved.   In addition to the medical findings, the ALJ stated plaintiff's daily

2  activities were inconsistent with his complaints of excessive pain.

3          Plaintiff's daily activities, according to the ALJ, included household chores,

4  shopping, maintaining his personal appearance, occasionally cooking and driving a car.

5  However, according to plaintiff's actual daily activities logs, his "household chores" consists of

6  folding clothes, starting a load of laundry, making a bed, and sometimes washing the dishes in

7  shifts.  Plaintiff's mother "does the bulk of the housework.  (CAR 83, 95).  "Shopping" consists

8  of getting bread or milk when needed, maybe once a week, but always in short trips.  Plaintiff's

9  mother does the main shopping.  (CAR 83, 95).  For "maintaining his personal appearance"

10 plaintiff states that he does not "shave most of the time because it takes so long to do [I do it] in

11 shifts with rest in between." (CAR 82, 94).  Plaintiff's occasional cooking includes cooking

12 "once or twice a month.  Casseroles or oven dishes, meals I can throw together and then rest

13 while they cook." (CAR 83).  He also will fry an egg for breakfast once or twice a week.  (CAR

14 95).  Plaintiff does drive his car to doctors or to the store, but "the rest of the time [he] ride[s] in

15 the car."  (CAR 84).  If plaintiff is going over ten miles, he has someone drive him.  (CAR 96).

16          Plaintiff's activities log does not appear to the court to be a significant source of

17 activities that would amount to substantial gainful activity.  Plaintiff's activities set forth in the

18 daily activities log are not inconsistent with the amount of pain plaintiff indicates he experiences,

19 nor is it inconsistent with the amount of activity he claims he is capable of.  Plaintiff's log

20 indicates the activities he engages in are limited in duration and exertion, and he must rest in

21 between activities, laying down as necessary.  Therefore, the court does not find Plaintiff's daily

22 activities as a reasonable reason for discrediting plaintiff's pain testimony.

23          However, plaintiff's activities was just one of the reasons set forth in the ALJ's

24 opinion as reasons for discrediting plaintiff's pain testimony.  The others include the lack of

25 objective medical evidence for the amount of pain plaintiff claims, a lack of medical care since

26 2002, a report that his back pain had resolved, and the possibility that his symptoms are the

1   byproduct of malingering.  These reasons are clearly identified and  are supported by the record.

2   Also, inconsistent with plaintiff's claims of back pain and the inability to sit for more than 30

3   minutes, the court notes that in plaintiff's mental health evaluation in November 2004, plaintiff

4   was observed to have sat for two hours in a chair with his legs crossed without any sign of

5   distress.  This would further support the ALJ's finding that plaintiff's pain testimony was not

6   substantially credible.  Therefore, this court finds the ALJ's reasons for discrediting plaintiff's

7   pain testimony are clear and convincing and the ALJ did not err in finding plaintiff's testimony

8   not substantially credible.

9        **C.   Hypothetical Questions**

10            Finally, plaintiff contends that the "ALJ erred by basing his decision on the

11   opinion of the vocational expert, based on an incomplete hypothetical which failed to accurately

12   reflect plaintiff's condition and by disregarding the vocational expert's answer when questioned

13   concerning plaintiff's actual condition as evidenced by the record."  Plaintiff's argument is based

14   on his assertion that the ALJ erred in determining petitioner's limitations due to his bulging disc

15   and pain.

16            Hypothetical questions posed to a vocational expert must set out all the

17   substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

18   Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

19   limitations, the expert's testimony as to jobs in the national economy the claimant can perform

20   has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

21   the ALJ may pose to the expert a range of hypothetical questions, based on alternate

22   interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

23   determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

24   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

25   / / /

26   / / /

1        Using the limitations set forth in the physical residual functional capacity

2   assessment (CAR 377), the ALJ presented to the vocational expert a hypothetical which included

3   the following limitations :

4            can lift and carry 20 pounds occasionally, lift and carry 10
             frequently, stand and/or walk with normal breaks about six hours
5            in an eight-hour workday, can sit with normal breaks about six
             hours in an eight-hour workday, cannot climb ropes or scaffolds,
6            can climb ramps and stairs occasionally, kneel, crouch and crawl
             and stoop occasionally, balance frequently. ... The claimant is able
7            to remember locations and work experience, not limited and can
             remember and understand simple short instructions, there's
8            moderate limitations in ability to understand simple short
             instructions, there's moderate limitations in ability to understand
9            and remember detailed instructions and to carry out the detailed
             instructions.  So in that area, he's moderately limited... Based on
10           these limitations as indicated, can he do any of his past relevant
             work? (CAR 636).

11

12  The vocational expert answered as follows:

13           I would say he could perform the work of a security guard but the
             courtesy clerk is medium, the ride operator, it can be very active.  It
14           can be sometimes more stooping ... so I would eliminate that and
             also the travel agent can be detailed.  It, you're working with a
15           computer.  You have to follow maybe one train of thought at a time
             in order to get the booking.  So I would eliminate that but I feel
16           like the security guard would still be viable with this hypothetical.
             (CAR 636).

17

18  The ALJ then gave the vocational expert another hypothetical as follows:

19           Can lift and carry up to 10 pounds occasionally, less than 10
             pounds frequently, stand and walk at least two hours in an eight-
20           hour workday with normal breaks, can sit about six hours in an
             eight-hour workday with normal breaks, cannot climb ladders,
21           ropes or scaffolds, he's able to climb ramps, stairs, balance, stoop,
             kneel crouch and crawl occasionally, he's to avoid concentrated
22           exposure to hazards and the same mental limitations I gave you in
             hypo one. . . Can he do any of his past relevant work, like, security
23           guard?  (CAR 637).

24  The vocational expert stated "I would eliminate all his past work with this hypothetical."  The

25  ALJ then asked about other jobs.  The vocational expert stated other jobs that could be done with

26  this hypothetical would be surveillance system monitor (for which there were 167 jobs in Oregon

and 12,908 jobs in the United States), food order clerk (for which there were 212 jobs in Oregon and 17,174 in the United States), and sedentary assembler (for which there were 422 jobs in Oregon and 28,384 in the United States).  These were representative jobs given this hypothetical. (CAR 637-38).

As stated above, the ALJ's findings that petitioner's pain testimony was not substantially credible was not erroneous.  In addition, the ALJ did not err in rejecting plaintiff's treating physician's assessment.  The ALJ's decision to resolve the conflicting medical opinions against the treating physician was not in error and was supported by the record.  As such, using the limitations set forth in the physical residual functional capacity assessment as the basis for the hypothetical, instead of the treating physician's assessment was not in error.  This hypothetical was supported by substantial evidence in the record as a whole.

**IV.  CONCLUSION**

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.     Plaintiff's motion for summary judgment is denied;

      2.     Defendant's cross-motion for summary judgment is granted; and

      3.     The Clerk of the Court is directed to enter judgment and close this file.

DATED:   September 4, 2007.

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE